**Michael MA, Plaintiff–Appellant,**

v.

**CONTINENTAL BANK N.A., Defendant–Appellee.**

No. 89–2844.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1990.

Decided June 21, 1990.

Arthur L. Klein, Hal R. Morris, Teresa C. Kopriva, Arnstein & Lehr, Chicago, Ill., for plaintiff-appellant.

Stephen Novack, Bruce Braverman, Novack & Macey, Chicago, Ill., for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SNEED, Senior Circuit Judge.*

EASTERBROOK, Circuit Judge.

Michael Ma, a citizen of the People's Republic of China, opened a money market account at Continental Bank N.A. on December 6, 1984, with a deposit of $150,000, transferred from Continental's subsidiary in Hong Kong, the same day a court of Hong Kong entered against Ma a judgment of HK $35 million, then equivalent to US $4.5 million. Ma left Hong Kong two days later for Toronto, leaving the judgment unsatisfied. Fong Sze Ming, the judgment creditor, commenced an involuntary bankruptcy proceeding against Ma in Hong Kong, and the court appointed the Registrar General of Hong Kong as the receiver and trustee of Ma's estate in bankruptcy.

In the course of marshalling the assets of the estate, P.K.C. Li, a solicitor representing the receiver, asked the Bank's subsidiary whether it held any of Ma's funds. Li learned that the funds formerly in the subsidiary's hands had been transferred to the parent, and he wrote the subsidiary asking what steps the Bank would require of him before remitting. The subsidiary then wrote Continental, "authorizing" it to transfer the money to the receiver. Continental did so on July 1, 1985, without notice to Ma. (Actually the Bank returned the money to its subsidiary, which remitted to the receiver; this detail is immaterial.)

The receiver collected more than US $400,000 from Ma's bank accounts and the sale of assets located in Hong Kong. In 1987 Ma asked the bankruptcy court to vacate the appointment on the ground that he had not been served with process. The bankruptcy court agreed with this argument. Before the question could be resolved on appeal, Ma settled with the judgment creditor. Ma abandoned to his creditor all assets in the hands of the receiver and paid an additional HK $9.1 million; the creditor withdrew his appeal of the order dismissing the bankruptcy case.

Ma then filed this suit against Continental under the alienage jurisdiction, 28 U.S.C. § 1332(a)(2), contending that Continental broke its promise to hold the funds subject to his order. He asked for dam-

* Hon. Joseph T. Sneed, of the Ninth Circuit, sitting by designation.

ages equal to the amount of the deposit plus interest. The district court granted summary judgment to the Bank, holding that Ma could not establish damages because the money went to the receiver and thence to Ma's creditor, so he received its value. The difficulty with this conclusion springs from Ma's affidavit, which informs us (without contradiction from the Bank) that the receiver's expenses of gathering and selling the property consumed about half of its value, and that a combination of court costs and receiver's fees leaves little if any to turn over to the creditor. Given the posture of the case and the lack of an official report from the receiver detailing the disposition of the funds in his custody, we must assume that Ma received precious little credit against the judgment on account of the receiver's efforts. It is as if the receiver laid his hands on a Tang horse later smashed in transit: the creditor would allow in settlement no more than the value of the shards of pottery, and Ma would suffer injury equal to the difference between the horse whole and the rubble.

■ It does not follow that Ma is entitled to recover the $150,000 (or a horse) from the Bank. We may assume that the Bank broke the deposit contract. We also assume that Ma owns the right of action against the Bank. (Any claim on the contract may well be an asset of the estate in bankruptcy under Hong Kong law; we do not pursue the question because neither side noticed the difficulty.) There is still a matter of causation. Continental did not promise to resist or ignore lawful process. A receiver appointed in the United States would have been entitled to the funds without ado by virtue of 11 U.S.C. § 542(b). A stakeholder who in good faith turns assets over to a trustee is not answerable for the trustee's subsequent acts, even if they greatly deplete the assets. *Restatement (Second) of Trusts* § 321. Section 542 does not apply to a foreign trustee, but 11 U.S.C. § 304 authorizes proceedings ancillary to foreign bankruptcy cases. Once the "foreign representative" (the generic statutory term for trustees, receivers, and the like) files a petition, the court may direct the stakeholder to surrender the assets,

§ 304(b)(2). The receiver did not file a proceeding under § 304, so the Bank does not get the immunity a judicial turnover order would have provided, but the omission seems to work for rather than against Ma: had the receiver filed suit in this country to obtain a § 304(b)(2) order, the costs of administration would have been even higher than they were.

■ Not so fast!, Ma rejoins. If the receiver had filed an ancillary action under § 304, he would have been met by the defense that the Hong Kong court should have dismissed the creditor's petition without appointing a receiver. Yet nothing in § 304 suggests that an American court will indulge a collateral attack on the appointment of a receiver. Courts of the United States enforce foreign judgments provided that the parties had the opportunity to present their claims to foreign tribunals following procedures designed to secure a sound administration of justice. E.g., *Hilton v. Guyot*, 159 U.S. 113, 202–03, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Clarkson Co. v. Shaheen*, 544 F.2d 624 (2d Cir.1976), applied to a case under § 304 by *In re Gee*, 53 B.R. 891 (Bankr.S.D.N.Y.1985). Section 304 applies to any "foreign representative"; the receiver unquestionably was such a person. Hong Kong uses the legal procedures of the United Kingdom; Ma does not question the sufficiency of the procedures available there. He also does not contend that the considerations listed in § 304(c) offered sufficient reason not to enter a turnover order.

■ Matters are a little more complex because of the principle that a collateral attack on a foreign judgment is possible when the foreign court lacks jurisdiction, *Koster v. Automark Industries, Inc.*, 640 F.2d 77 (7th Cir.1981), and Ma stresses that in 1987 a court in Hong Kong vacated the proceeding because of failure to serve process on Ma personally. *Ex parte Fong Sze Ming*, 1987 No. 77 (H.K.Ct.App.). One obstacle to this analysis, which the Bank does not mention, is that the appointment of a receiver is not a "judgment"; it may well be that procedural steps leading to a judg-

ment should be recognized in the United States prior to service. See *Cunard S.S. Co. v. Salen Reefer Services AB*, 773 F.2d 452, 457–58 (2d Cir.1985); *In re Enercons Virginia, Inc.*, 812 F.2d 1469, 1473 (4th Cir.1987). One further complication is that the receiver in Hong Kong may have had authority ("jurisdiction") because of the location of assets there; principles of *in rem* and *quasi in rem* jurisdiction do not depend on jurisdiction over the person of all claimants. See *Canada Southern Ry. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). None of the parties makes anything of this either, so we shall press on.

Although service of process is an ingredient of personal jurisdiction as that term often is used in the United States, not all of the technical requirements of service are sufficient grounds for a collateral attack. Service is designed to produce knowledge; although rules may and usually do require formal service in order to make very sure of knowledge, and courts may dismiss a case when proper service has not been secured, the sort of jurisdiction pertinent to a collateral attack depends on whether the service is constitutionally adequate—that is, whether the plaintiff uses a method reasonably calculated to produce actual notice. *Wuchter v. Pizzutti*, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1928). (Although Hong Kong is not bound by our notions of due process, recognition of foreign judgments is a matter of comity, and as *Hilton* explains the United States will not enforce a judgment obtained without the bare minimum requirements of notice—although it does not insist on the additional niceties of domestic jurisprudence.)

Process was mailed to Ma at his Hong Kong residence. This is reasonably calculated to produce notice, especially when (as here) the party has not told anyone he has moved permanently (and, if so, to where). *Virginia Lime Co. v. Craigsville Distributing Co.*, 670 F.2d 1366 (4th Cir.1982) (mail to last known address is constitutionally sufficient). Ma did not receive the notice, because he treated his journey to Canada as more than a vacation, but he had actual knowledge of the proceeding. His

daughter, who still lived at his house, called him in Switzerland (where he now resides) and told him about the case; Ma authorized his daughter to engage a firm of solicitors to represent him, and she did. Ma signed a retainer agreement with this firm on May 29, 1985, a little more than two months after the commencement of the bankruptcy case. Ma's affidavit recites these facts; Ma says that in 1985 he was "not aware of the seriousness of the bankruptcy proceedings", but this is a far cry from saying that he was not aware of the proceedings. Hong Kong had an unimpeachable claim to adjudicate Ma a bankrupt and administer his estate: Ma resided in Hong Kong and left substantial assets behind when he fled using travel documents issued by the Crown Colony; the judgment against him was entered by a Hong Kong court that unquestionably had personal and subject-matter jurisdiction. A district judge acting on a petition under § 304 would not try to determine technical questions of service, given Ma's knowledge and the conceded substantive power of the foreign court to adjudicate the claims.

■ So if the receiver had filed a proceeding under § 304 in 1985, he would have been entitled to the money. Indeed he might well have had it by default, for Ma does not allege in the complaint that either the receiver or the Bank knew his whereabouts in June and July of 1985. He had not changed the Hong Kong address on file with the Bank. When asked at oral argument, counsel for Ma replied that he did not know whether any communication from receiver or Bank could have reached Ma—unless perhaps they had mailed something to his home address in Hong Kong! Notice by publication in Chicago would hardly have helped Ma, and we do not believe that an ancillary proceeding under § 304 may be forever stalled by inability to track down the debtor, for the regular use of that section concerns debtors living outside the United States.

Banks rationally may insist that persons claiming to be foreign receivers file actions under § 304. If the receiver had been an impostor, or if the funds had been diverted

somewhere between Continental and the receiver, then the absence of an order under § 304(b)(2) would have left the Bank on the hook. See *Restatement* § 321. But the receiver turned out to be genuine, and the estate received the money. So far as Ma is concerned, the only difference between the informal procedure the Bank used and a formal proceeding under § 304 was the lack of an opportunity to wage a collateral attack on the receiver's appointment. As such an opportunity would have been worthless to Ma and would only have raised the costs of administering the estate, the procedures the Bank followed did not cause Ma any loss.

AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

The majority has taken its "horse" over the jumps here with the abandon of a true steeplechaser. Somehow it has managed to slip by what seems to me the real stone wall on the course. The Bank is, of course, located in Illinois, and the deposit contract was made explicitly subject to Illinois and federal law. There is absolutely no legal basis for the Bank to release funds at the request of a foreign receiver unless and until a petition has been filed under 11 U.S.C. section 304 to authorize ancillary proceedings in Illinois. At that point, a judge in Illinois may direct the surrender of the funds. That this might have cost the estate something is certainly not a good reason for waiving the requirement. To allow banks willy-nilly to ship their depositors' funds on demand to foreign receivers in the hope that the requests will subsequently prove legitimate seems to me very bad policy indeed.

The majority attempts to gallop around the fundamental barrier here by confidently asserting that, had the receiver made an application to the district court pursuant to section 304, the Hong Kong receiver's credentials would certainly have been accepted despite the service defect. Alternatively, as the majority notes, Ma may lack standing to sue because of the settlement with the judgment creditors. There may be substantial merit to these points, but they do not seem to me to legimate retroactively the unauthorized release of the funds by the Bank.

I therefore respectfully dissent to the extent indicated.