**Thomas KULEKOWSKIS, Anthony J. Lobue, Anthony DeSilva, Petitioners,**

v.

**Joseph G. DiLEONARDI, United States Marshall for the Northern District of Illinois, Respondent.**

Nos. 95 C 3103, 95 C 3104.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 7, 1996.

Gregory B. Craig and Matthew J. Herrington, Williams & Connolly, Washington, DC, Michael J. Howlett, Jr., and James D. Wilson, Shefsky & Froelich, Ltd., Chicago, IL, for Petitioners.

Thomas P. Walsh and Joel D. Bertocchi, United States Attorney's Office, Chicago, IL, for Respondent.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Petitioners Thomas Kulekowskis ("Kulekowskis"), Anthony J. Lobue ("Lobue"), and Anthony DeSilva ("DeSilva"), have brought

before this court their petition for habeas corpus on appeal from a Certification of Extraditability issued by U.S. Magistrate Judge Edwin Bobrick. The Magistrate Judge entered the extradition order pursuant to an action filed by the U.S. Attorney, at the request of the government of Canada, seeking petitioners' extradition to Canada for allegedly kidnapping and transporting DeSilva's wife and ward, Tammy DeSilva, to the United States.

## STATEMENT OF FACTS

Anthony DeSilva and Tammy Lynn Wright ("Tammy") married in October 1986, and bought a home together in Winnipeg, Canada. In December 1987, DeSilva and Tammy were involved in a serious automobile accident in Monee, Illinois. Tammy survived, but sustained injuries to her spine and brain which left her a quadriplegic with permanent and extensive brain damage. In February 1988, DeSilva petitioned the Circuit Court of Cook County to bestow Tammy's guardianship upon him. Tammy's parents, Ernest and Christina Wright, were timely served with notice of the guardianship proceedings. Mr. Wright appeared by counsel at the proceedings to contest DeSilva's appointment. On March 24, 1988, despite Mr. Wright's objections, the court appointed DeSilva sole guardian of his wife's estate and person with no restrictions. In June 1988, in an effort to recover on Tammy's behalf, DeSilva filed a lawsuit against the trucking company involved in the accident.

Throughout 1988, DeSilva cared for Tammy at their Chicago area home. Mrs. Wright moved in with the couple to assist in her daughter's care. Despite devoting all his earnings, medical coverage, a disability payment from Tammy's Canadian automobile insurance carrier, and, eventually, even public aid to Tammy's care, the medical expenses soon exhausted DeSilva's financial resources. In January 1989, DeSilva, Tammy, and Mrs. Wright moved in with DeSilva's parents, Albert and Sally DeSilva, in Arizona. Mr. and Mrs. DeSilva spared no expense as they cared for Tammy, contributing upwards of $50,000.00 to her medical and living expenses. Realizing his parents' hardships,

DeSilva decided to relocate to Canada. In July 1989, DeSilva moved Tammy to their home in Winnipeg where she was eligible for socialized health care services. DeSilva granted Mrs. Wright permission to live in his home so long as she assisted in her daughter's care. Unable to find sufficient employment in Canada, DeSilva returned to the U.S. in search of work.

As part of DeSilva's lawsuit against the trucking company involved in the December 22, 1987, accident, it became necessary for Tammy to undergo a medical examination. On January 31, 1992, DeSilva's lawyer, Timothy J. Touhy, appeared before Judge James W. Kennedy of the Probate Division of the Circuit Court of Cook County seeking an order authorizing his client to bring Tammy to Chicago for a medical examination. Judge Kennedy told Mr. Touhy that DeSilva did not require official court authorization to bring Tammy to Chicago. Mr. Touhy explained that his client feared that Tammy's father, having previously demonstrated hostility towards DeSilva, might interfere with any efforts to move Tammy. In the interest of avoiding a possible dispute between DeSilva and the Wrights, Judge Kennedy entered an order authorizing DeSilva to bring Tammy back to Chicago for a medical evaluation, and enjoining third persons from interfering.

Despite Judge Kennedy's confidence in DeSilva's guardianship authority, the prospect of interference by Mr. Wright continued to concern Mr. Touhy and his partner, Mr. Engelland. They requested their friends, petitioners Kulekowskis and Lobue, to accompany DeSilva in order to deter Mr. Wright from acting out his threats of violence. As veteran Chicago police officers, Kulekowskis and Lobue thought it wise to contact the Winnipeg Police as a way of preempting any confusion or interference from local Canadian authorities.

The following day, February 1, 1992, Mr. Touhy contacted the Winnipeg Police Department and spoke to Duty Inspector Donald MacDiarmid. After explaining his client's plans to transport his wife and ward to Chicago, Mr. Touhy inquired whether he had to submit a copy of Judge Kennedy's order to the local Canadian authorities. Offi-

cer MacDiarmid informed Mr. Touhy that since no Canadian court order barred Tammy's removal, his client's intentions were not a police matter. Mr. Touhy conveyed this information to the petitioners.

Based upon his status as Tammy's guardian and the inquiries and representations of his attorney, DeSilva set out on February 3, 1992, for his home in Winnipeg in order to bring Tammy back to Chicago for a medical evaluation. DeSilva's father Albert, Mr. Kulekowskis, Mr. Lobue, and a registered nurse, accompanied him.

After a routine customs stop at the Canadian border the parties continued on their way, arriving at DeSilva's home in Winnipeg shortly after 6:30 a.m. Following a brief exchange of words with Mrs. Wright, during which DeSilva informed her that he had come to take Tammy back to Chicago for a medical examination and presented her with a copy of the court order authorizing him to do so, DeSilva and the nurse proceeded to peaceably move Tammy from her room to the car. While there is considerable disparity surrounding the details of Mrs. Wright's interaction with the parties during their brief time in the home, it is clear that Mrs. Wright did not acquiesce to her daughter's removal. After a failed attempt to contact her brother-in-law, Mrs. Wright telephoned the local police and told the operator that her daughter had been taken away by people who had a court order. The operator informed Mrs. Wright that local authorities did not consider this a police matter in light of the court order authorizing the parties' conduct. Mrs. Wright then called her attorney, Robert Tapper, who in turn spoke with Staff Sergeant William VanderGraaf of the Winnipeg Police Department, shortly before 7:30 a.m. Mr. Tapper told Sergeant VanderGraaf that Tammy's husband had kidnapped her from her home in Winnipeg. Mr. Tapper did not inform Sergeant VanderGraaf of DeSilva's legal guardianship over Tammy. Sergeant VanderGraaf, in conjunction with members of the Royal Canadian Mounted Police (RCMP), and the Ontario Provincial Police, arranged for DeSilva and his companions to be stopped at the border on their way back to the United States.

When the petitioners arrived at the border at approximately 8:45 a.m. they were questioned by both U.S. customs officials and Canadian police. Despite DeSilva's being the sole person with legal authority to consent on Tammy's behalf, border officials questioned Tammy directly. Both before and after receiving the aid of her computer, Tammy indicated that she desired to be with her husband and, yet, remain in Winnipeg. The officers also questioned DeSilva, Kulekowskis, and Lobue. After recounting their story, and providing copies of DeSilva's guardianship papers and Judge Kennedy's order, the petitioners were released and told that they were free to go home. The parties agreed that since Tammy's parents had just obtained an emergency guardianship order from the Court of Queen's Bench in Winnipeg, it would be best to return Tammy to Winnipeg while the petitioners continued back to Chicago. The customs officers separated DeSilva and Tammy despite Tammy's repeated emotional requests for her husband to remain with her.

On February 4 and February 7, 1992, Canadian authorities interviewed Tammy at her and DeSilva's home in Winnipeg, apparently unconcerned that she had been declared incapable of making meaningful decisions. During these two interviews, authorities asked Tammy how she felt about charging five people with a criminal offense. Tammy nodded "yes" and indicated "do it" on the computer. She further indicated she was scared during the entire incident. Tammy's interviewers never disclosed to her the identity of the five people against whom they sought the criminal charges, nor the precise nature of the charges themselves. Tammy never submitted a statement, affidavit, or sworn testimony relating to this matter. Indeed, she is incapable of so doing. Despite this, however, Canadian authorities charged petitioners with kidnapping and forcible seizure of DeSilva's wife and ward. At Canada's request, the U.S. Attorney sought the extradition of all the participants. On March 28, 1995, the Magistrate Judge certified De-Silva, Kulekowskis, and Lobue, for extradition to Canada.

Faced with imminent removal to Canada, petitioner's brought before this court a writ of habeas corpus seeking relief from the outstanding extradition order. In support of their habeas petition, petitioners make the following claims: (1) the United States Extradition Statute 18 U.S.C. § 3184 is unconstitutional insofar as it violates the principle of separation of powers; (2) the Magistrate Judge's exercise of jurisdiction over extradition proceedings violates Article III of the Constitution; (3) the appearance of the U.S. Attorney in an extradition proceeding on Canada's behalf violates the Emoluments Clause of the Constitution; (4) there is insufficient evidence to support a finding of probable cause with respect to the requisite intent necessary to commit the offense of kidnapping; (5) petitioners suffered from ineffective assistance of counsel; (6) the dual criminality element mandated by the Treaty of Extradition between the U.S. and Canada (the "Treaty") is lacking.

This court will grant petitioners' habeas relief since it finds that the dual criminality requirement of the Treaty has not been complied with. Since this finding is dispositive, the court need not address petitioners' other claims.

## THE SCOPE OF THIS COURT'S HABEAS REVIEW

■ This court has jurisdiction to review the Magistrate Judge's decision on a writ of habeas corpus. 28 U.S.C. § 2241. The standard of review on a habeas corpus petition is *de novo* when the issues presented are questions of law or mixed questions of law and fact. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.1986); *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir.1984).

■ In the instant case, the determinative issue is whether or not the dual criminality requirement of the Treaty has been met. This question is purely a legal one. Article 2 of the Treaty as amended provides that: "Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment ... for a term exceeding one year or any greater punishment." Similarly, Article 10 of the Treaty provides in pertinent

part that: "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person would be found ... to justify his committal for trial if the offense of which he is accused had been committed in its territory ...[.]" These provisions constitute the dual criminality doctrine. The doctrine requires the court to make two findings: (1) whether petitioners' conduct violated Canadian law, and (2) whether such conduct would have also violated Illinois or Federal law, had the crime been committed in Illinois. It is the second of these requirements, with respect to the petitioners' conduct in the present case, that this court finds lacking.

## ANALYSIS

In certifying their extradition, the Magistrate Judge held that the petitioners knowingly confined and transported Tammy from her home in Winnipeg, Canada, into the United States without lawful authority. *In re Extradition of Kulekowskis, et al.*, 881 F.Supp. 1126, 1149 (N.D.Ill.1995). In order to determine whether such conduct would violate Illinois law, The Magistrate Judge constructed a hypothetical in which the alleged misconduct transpired in Illinois. In constructing this hypothetical, all significant facts were "reversed." In the instant case, this resulted in a scenario in which a Canadian guardian removed his ward from the state of Illinois. After examining petitioners' conduct under this hypothetical reverse fact scenario, the Magistrate Judge determined that their conduct would have violated Illinois law—thus fulfilling the Treaty's dual criminality requirement.

The Magistrate Judge acknowledged that had all the relevant events occurred in Illinois, the petitioners' conduct would not be criminal: "[Petitioners] are correct that if they had taken Tammy from her home in Illinois ... they would not have committed a crime ...," thus, "... if Tammy had been living in Illinois he [DeSilva] could not be guilty of kidnapping or unlawful confinement in taking her to a medical examination ...[.]" *In re Extradition of Kulekowskis, et al.*, 881 F.Supp. at 1137. Under the reverse fact scenario, then, the pivotal issue becomes

whether the petitioners would be guilty of kidnapping had they attempted to remove Tammy from Illinois while acting under a valid Canadian guardianship order's protection.

The respondent and the Magistrate Judge construct a twofold argument in support of petitioners' guilt under the hypothetical dual criminality analysis: (1) petitioners would have failed to obtain recognition of DeSilva's Canadian guardianship by registering it in Illinois, and, (2) when faced with a Canadian guardianship, as a purported bar to criminal proceedings, an Illinois court would not automatically accord it full faith and credit. *Kulekowskis, et al.*, 881 F.Supp. at 1140.

With respect to the first point above, the respondent argues that absent some type of official recognition from an Illinois court, a Canadian guardianship would be void and would provide no protection to a guardian acting pursuant to its authority. Therefore, under the reverse fact scenario, had DeSilva sought to remove Tammy from Illinois, his actions would be criminal insofar as his Canadian guardianship order would not have been registered in Illinois.

The second aspect of the argument favoring the petitioners' guilt is made by the Magistrate Judge. Regardless of any registration requirement, the Magistrate Judge held that Illinois would not accord *automatic* full faith and credit to a Canadian guardianship decree. This holding stems from the Magistrate Judge's belief that decisions to defer to foreign judgments are entirely "discretionary determinations." *Kulekowskis, et al.*, 881 F.Supp. at 1140. This mere possibility that Illinois might not recognize a Canadian guardianship was sufficient, for the Magistrate Judge, to halt his inquiry into whether or not Illinois would *in fact* recognize DeSilva's foreign guardianship. Without any further development of the dual criminality analysis, the Magistrate Judge decided that the possibility of "non-recognition" satisfied the dual criminality requirement.

In support of his holding that Illinois would not grant comity to DeSilva's Canadian guardianship order, The Magistrate Judge argued that comity determinations are en-

tirely discretionary—even among sister-states of the Union. *Kulekowskis, et al.*, 881 F.Supp. at 1138–41. Furthermore, both he and the respondent cited cases in which Illinois did not recognize a foreign guardianship order. *Kulekowskis, et al.*, 881 F.Supp. at 1138–41.

I. *Illinois has no requirement that foreign orders be registered in order to be valid in Illinois.*

In determining whether petitioners are guilty of the crime of kidnapping under Federal or Illinois law, it is necessary to examine the allegedly criminal aspects of their conduct as though they had transpired in Illinois. Respondent argues that absent some type of official recognition from an Illinois court, a Canadian guardianship would be void and would provide no protection to a guardian acting pursuant to its authority. This is simply wrong. There is no law in Illinois, either statutory or judicially derived, which imposes such a registration requirement. Indeed, according to the Restatement (Third) of the Foreign Relations Law of the United States: "No procedures exist in the United States for registration of foreign country judgments, or for their validation by *exequatur* (i.e., an endorsement by order of a court authorizing execution)." Restatement (Third) of the Foreign Relations Law of the United States § 481 Pt. IV, cmt. g, (1986).

While it is true that some foreign guardianship orders are denied recognition when challenged, this is not evidence of an indiscriminate, state-wide, presumption as to the invalidity of all foreign orders. Thus DeSilva, had he sought to remove Tammy from Chicago to Winnipeg, would not have had to register or seek recognition of his valid Canadian guardianship by an Illinois court prior to removing his ward from the state.

II. *The Magistrate Judge's dual criminality analysis is flawed.*

Since, under the hypothetical reverse fact scenario, Illinois would not require a Canadian guardian to pre-emptively register his guardianship in Illinois, the second issue in the analysis is whether Illinois would accord

full faith and credit to a Canadian guardianship decree when presented with it as a defense to a criminal prosecution.

In his analysis of this issue, the Magistrate Judge held that Illinois would not accord *automatic* full faith and credit to a Canadian guardianship decree. Accordingly, he concluded that the dual criminality requirement of the Treaty had been met because a Canadian guardianship might not be recognized. The mere possibility that Illinois might not recognize a Canadian guardianship was sufficient, for the Magistrate Judge, to halt his inquiry into whether the dual criminality element was met. It is this premature curtailment of the analysis, however, which causes the Magistrate Judge's reasoning to be in error. Even though there is an element of discretion in the decision whether to grant comity to a foreign judgment, the Magistrate Judge did not complete the analysis. That a hypothetical order might be so deeply flawed that it would pose no barrier to a criminal conviction is obvious. What the Magistrate Judge should have done, but did not, is determine whether a guardianship order *like the one in the instant case* would be granted full faith and credit, and would thus operate as a shield to conviction.

The Magistrate Judge's error stems from his belief that decisions to defer to foreign judgments are entirely "discretionary determinations." *Kulekowskis, et al.,* 881 F.Supp. at 1140. Such an interpretation of comity is fallacious insofar as it casts the decision of whether to accord recognition to a foreign judgment in an arbitrary and whimsical light. Furthermore, the Magistrate Judge erroneously concluded that: "Unless a foreign guardianship order would be an absolute bar to criminal proceedings, respondents conduct would be *punishable* under Illinois law . . .[.]" *Kulekowskis, et al.,* 881 F.Supp. at 1140. This is wrong because foreign guardianship orders do not automatically bar criminal proceedings against their holders for the same reason that the decision whether to accord them deference as a matter of comity is not entirely arbitrary—recognition of their authority is conditioned on the application of

a four-part test.[1] *Hilton v. Guyot,* 159 U.S. 113, 166–68, 16 S.Ct. 139, 144–45, 40 L.Ed. 95 (1895) (establishing the original four-part federal comity test).

III. *The Magistrate Judge mistakenly interpreted old Illinois law to argue that granting full faith and credit to guardianship decrees between sister-states is discretionary.*

In an effort to bolster his claim that Illinois would not accord full faith and credit to a Canadian guardianship order, the Magistrate Judge constructed an argument based on old Illinois case law and inaccurate notions of comity. Looking to support his holding, that full faith and credit determinations among different countries are entirely discretionary, the Magistrate Judge argued that such determinations are entirely discretionary even among sister-states of the Union. After extensively quoting the Illinois Supreme Court's decision in *Noonan v. Wingate,* which in turn discusses a Massachusetts court's refusal to accord full faith and credit to an Illinois guardianship decree,[2] the Magistrate Judge concluded that: "The foregoing . . . confirms our reading of *Noonan* as stating an *unconditioned* rule that comity never requires the recognition of a foreign guardianship over a child found within the state" (emphasis added). *Noonan v. Wingate,* 376 Ill. 244, 33 N.E.2d 467, 470–71 (1941); *Kulekowskis, et al.,* 881 F.Supp. at 1139. The Magistrate Judge's reasoning is dubious.

The Magistrate Judge's interpretation of *Noonan* is flawed in that he once more sounds an exaggerated note of discretionary decision making where none belongs. After adopting an overly liberal reading of comity's discretionary aspects, he then imputes such aspects to the practice of full faith and credit among sister-states. This is problematic. Such imputations are unsound because, unlike the granting of comity to foreign judgments, the granting of full faith and credit to judicial proceedings among sister-states is constitutionally mandated. US Const art IV, § 1, cl 1. As such, the extension of full faith

---

1. See discussion infra, § IV.

2. *Woodworth v. Spring,* 86 Mass. 321, 4 Allen 321 (1862).

and credit among sister-states is entirely devoid of discretionary or arbitrary decision making. The Appellate Court of Illinois made this clear when it stated in *Champion v. Champion* that, "... the constitutional obligation of this State to give full faith and credit to a decree of a sister state ... is an entirely different matter [than comity]." *Champion v. Champion*, 20 Ill.App.2d 271, 156 N.E.2d 16, 19 (1959). Additionally, in contrast to the four-part test governing the denial of recognition to foreign judgments, the extension of full faith and credit among sister-states may be withheld for only two reasons: "A judgment entered in one State must be respected in another provided that the first State had jurisdiction over the parties and the subject matter." *Nevada v. Hall*, 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416 (1979). The Court in *Nevada* even goes so far as to hold that, "... in certain limited situations, the courts of one State must apply the statutory law of another State." *Nevada*, 440 U.S. at 421, 99 S.Ct. at 1188. Thus, because the extension of full faith and credit among sister-states is a strictly regulated constitutional obligation, it is distinguishable from comity's international applications. The Magistrate Judge's imputation of the somewhat more flexible legal criteria of international comity to the legal relations among sister-states is therefore misguided.

IV. *While recognition of foreign judgments is not as strictly mandated as the practice of full faith and credit between sister-states, Illinois would still grant full faith and credit to a Canadian guardianship decree.*

 Despite there being no rule of law requiring the recognition of foreign judgments, there is a strong presumption favoring the extension of comity to foreign decrees. *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir.1995); *Philadelphia Gear Corporation v. Philadelphia Gear de Mexico*, 44 F.3d 187, 191 (3rd Cir.1994); *Remington Rand Corporation–Delaware v. Business Systems Inc.*, 830 F.2d 1260, 1266 (3rd Cir.1987). Comity is a recognition which one *nation* extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to *international* duty and convenience and the rights of persons protected by its own laws [as opposed to those of other nations].

*Clubb v. Clubb*, 402 Ill. 390, 84 N.E.2d 366, 371 (1949). While not as strictly regulated as the practice of full faith and credit among sister-states, the decision whether to extend comity to foreign judgments clearly rests on more than an arbitrary desire to courteously accommodate another nation's judicial requests.

In *Brady v. Brown*, the court held that under the doctrine of comity "... 'the forum state will generally apply the substantive law of a foreign sovereign to causes of action which arise there'." *Brady*, 51 F.3d at 816. Likewise, the Restatement (Third) of the Foreign Relations Law of the United States reads: "A foreign judgment is generally entitled to recognition by courts in the United States ...[.]" Restatement (Third) of the Foreign Relations Law of the United States § 481 Pt IV, cmt c, (1986). Furthermore, the lofty standards which courts must meet in support of a decision not to grant comity to a foreign order are meant to encourage the recognition of foreign judgments. *Remington Rand*, 830 F.2d at 1266; *Universal Minerals v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3rd Cir.1981). In *Remington Rand*, the court held that: "Findings of fact underlying a decision to extend comity, however, are governed by the *clearly erroneous* standard" (emphasis added). *Remington Rand*, 830 F.2d at 1266.

The extension of recognition to a foreign country's judgment is contingent upon the establishment of a prima facia case that the judgment is entitled to recognition. *Hilton*, 159 U.S. at 166–68, 16 S.Ct. at 144–45. The four criteria which the Supreme Court set out for the recognition of a foreign judgment in *Hilton* are still followed today. *Ma v.*

*Continental Bank N.A.*, 905 F.2d 1073, 1075 (7th Cir.1990); *In re Marriage of Lanae Silvestri–Gagliardoni*, 186 Ill.App.3d 46, 134 Ill.Dec. 106, 108, 542 N.E.2d 106, 108 (1989); *Hunt v. BP Exploration Co. Ltd.*, 492 F.Supp. 885, 894 (N.D.Tex.1980);

> "The elements required to establish a prima facia case of entitlement of recognition of a foreign country judgment are that the rendering court had jurisdiction over the person and subject matter; there was timely notice and an opportunity to present the defense; no fraud was involved; and the proceedings were according to a civilized jurisprudence."

*Silvestri–Gagliardoni*, 186 Ill.App.3d at 51, 134 Ill.Dec. at 110, 542 N.E.2d at 110. Considering the case at bar in light of these four requirements, it is apparent that had DeSilva's hypothetical Canadian guardianship over Tammy been obtained in the same manner and under the same conditions as his actual Illinois guardianship was—it would be recognized in Illinois. First, there clearly would be personal and subject matter jurisdiction since DeSilva and Tammy resided in the forum state. Second, the Wright's had notice and opportunity to present a defense. Mr. Wright appeared at the guardianship hearing through counsel while Mrs. Wright, after being served with notice of the proceedings, consulted with Tammy's ad litem appointed guardian who represented her at the hearing. Third, no suggestions of fraud have been advanced. Fourth, there is no doubt that a proceeding identical to the Illinois hearing would qualify as being conducted in accordance with civilized jurisprudence. Consequently, under the principles of comity, an Illinois court would have been required to recognize the Canadian custody order, had DeSilva's guardianship appointment been done in Canada.

Illinois' propensity to grant recognition to a foreign judgment is also indicated by its adoption of the Uniform Child Custody Jurisdiction Act ("UCCJA"), Ill.Rev.Stat.1987, ch 40, pars 2101–2126, and the Uniform Foreign–Money Claims Act ("UFMCA"), 735 ILCS 5/12–630, both of which facilitate and encourage the recognition and enforcement of foreign judgments in Illinois.

The Illinois Appellate Court recognized the validity of a foreign judgment when it upheld an Italian child custody order, after applying both the Supreme Court's standards and those of the UCCJA. *Silvestri–Gagliardoni*, 186 Ill.App.3d at 49, 134 Ill. Dec. at 109, 542 N.E.2d at 109. In *Silvestri–Gagliardoni*, a husband and wife obtained a divorce in Italy and the Italian court entered a separation and custody judgment. The proceedings met the requirements of proper jurisdiction, notice, lack of fraud, and civilized jurisprudence. Subsequently, the wife filed a petition for dissolution in an Illinois court seeking to re-litigate issues formerly decided by the prior Italian judgment. *Silvestri–Gagliardoni*, 186 Ill.App.3d at 47, 134 Ill.Dec. at 108, 542 N.E.2d at 108. The trial court dismissed the wife's petition for dissolution and the Illinois Appellate Court affirmed the dismissal, citing the UCCJA's foreign judgment recognition requirements:

> Since the case at bar involves the custody decree of a foreign nation, the provisions of the UCCJA became operational to determine whether the trial court had jurisdiction.... The provisions of this Act relating to the recognition and enforcement of custody judgments of other states apply to custody judgments and judgments involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons. Thus, the provisions of the UCCJA extend to foreign custody judgments.

*Silvestri–Gagliardoni*, 186 Ill.App.3d at 49, 134 Ill.Dec. at 109, 542 N.E.2d at 109. Both the Illinois Circuit and Appellate Courts found that the trial court lacked jurisdiction to consider the matter since its issues had been disposed of in a prior Italian decree. "... [T]he UCCJA operated in this case to deprive the Illinois court of jurisdiction by operation of the prior Italian decree. It is our opinion that the UCCJA compels Illinois courts not only to recognize proper custody decrees from foreign nations, but also that they must decline to accept jurisdiction to modify custody decrees ...[.]" *Silvestri–*

*Gagliardoni,* 186 Ill.App.3d at 149, 134 Ill. Dec. at 109, 542 N.E.2d at 109.

While Illinois courts are likely to grant comity to a foreign judgment in general, they are especially apt to recognize the rights of a foreign guardian where the ward is in Illinois pursuant to an agreement between the parties. *In re Guardianship of Arnold,* 114 Ill.App.2d 68, 252 N.E.2d 398, 400 (1969). In *Arnold* the trial court recognized an Ohio decree granting a father custody over his child and refused to impart guardianship to the mother while the child visited her in Illinois in accordance with the parents' visitation agreement. *Arnold,* 114 Ill.App.2d 68, 252 N.E.2d at 400. On appeal, the court did "... not find therein a basis to hold [that] the trial court abused its discretion in refusing to exercise jurisdiction over the mother's request. *Arnold,* 114 Ill.App.2d 68, 252 N.E.2d at 400.

The element of agreement between the parties, as in *Arnold,* is also present in the case at bar. Like the parents' visitation agreement in *Arnold,* DeSilva and Mrs. Wright agreed that Tammy should remain in DeSilva's Winnipeg home provided that Mrs. Wright promised to care for her. Thus, as it refused to trample on the father's Ohio guardianship decree in *Arnold,* Illinois would honor a Canadian guardianship order granting DeSilva the right to remove Tammy from Illinois after being left here pursuant to an agreement between himself and Mrs. Wright.

V. *Examples of cases where a foreign guardianship decree has not been recognized are distinguishable on two grounds.*

Both the Magistrate Judge and the respondent cite case law in support of the proposition that Illinois does not give automatic recognition to foreign guardianship orders. Both, however, overlook the significant aspects which distinguish their cases from the one at hand.

The cases of *Republic of Iraq v. First National Bank of Chicago,* and *Noonan v. Wingate* are cited by the Magistrate Judge and respondent as examples of occurrences when Illinois refused to grant recognition to a foreign guardianship decree. Reliance on these cases is misplaced because, in both instances, the original guardianship order was somehow flawed. *Republic of Iraq v. First National Bank of Chicago,* 350 F.2d 645, 649 (7th Cir.1965); *Noonan,* 376 Ill. 244, 33 N.E.2d at 469. In *Republic of Iraq,* Illinois refused to recognize an Iraqi guardianship decree because, among other reasons, the Iraqi decree lacked the elementary components of personal and subject matter jurisdiction over the parties. *Republic of Iraq,* 350 F.2d at 649. Consequently, since it could not meet the necessary threshold criteria to invoke the doctrine of comity, the Iraqi guardianship order did not receive recognition in Illinois. Similarly, in *Noonan,* the Illinois court refused to recognize a Massachusetts guardianship decree under either full faith and credit or comity. The court held that the Massachusetts court lacked personal jurisdiction over the minor in question, to say nothing about its failure to give notice and an opportunity to be heard to the child's custodians in Illinois. *Noonan,* 376 Ill. 244, 33 N.E.2d at 469.

In contrast to *Republic of Iraq* and *Noonan,* the facts of the present case involve a situation where the Illinois court did have personal and subject matter jurisdiction over the parties, and proper notice had been effectuated. The propriety of DeSilva's Illinois guardianship decree over Tammy is incontrovertible. Accordingly, under the reverse fact scenario, it must be assumed that had DeSilva been awarded guardianship of Tammy by a Canadian court, the hypothetical Canadian order would be as valid as the actual Illinois order. DeSilva's Canadian guardianship would, therefore, be a bar to successful prosecutions.

The second element which distinguishes the cases cited by the Magistrate Judge and respondent, in support of their claim that Illinois does not grant automatic recognition to foreign judgments, is the presence of competing custody claims. In both *Woodworth v. Spring,* and again in *Republic of Iraq,* the court questioned the validity of the respective guardianship orders in light of a competing custody claim. *Republic of Iraq,* 350 F.2d at 649; *Spring v. Woodworth,* 84 Mass. 206, 2 Allen 206, 207 (1862). In *Woodworth,*

the Massachusetts court refused to recognize an Illinois guardianship order because of a second valid guardianship claim in Massachusetts. The conflicting guardianship orders required the court to recognize the earlier of the two claims, and so the Illinois claim did not receive recognition due to its later issue. *Woodworth,* 2 Allen at 207. Similarly, in *Republic of Iraq,* an Illinois court refused to recognize an Iraqi guardianship order because of a second competing Illinois guardianship claim. The court elected to recognize the Illinois guardianship claim, even though it did not precede the Iraqi claim, because the Iraqi guardianship decree failed to meet comity's jurisdictional requirements. *Republic of Iraq,* 350 F.2d at 649.

Unlike the guardianship orders in *Woodworth* and *Republic of Iraq,* DeSilva's guardianship decree stands alone—unchallenged by a second competing order, and in compliance with the requirements of comity. The Magistrate Judge's observation that *Republic of Iraq* and *Woodworth* stand for the proposition that Illinois will not automatically recognize all foreign guardianship orders is correct, but only tells half the tale. Neither respondents nor the Magistrate Judge were able to point to a case in which a valid guardianship decree, in the absence of a competing claim, was denied recognition.

### CONCLUSION

In determining whether to extradite the petitioners to Canada on charges of kidnapping, it is necessary to examine their conduct under the reverse fact scenario required by the dual criminality element of the U.S.–Canada extradition treaty. Under this reverse fact scenario, Illinois would be unable to successfully prosecute the petitioners for kidnapping because it would not require DeSilva to register his Canadian guardianship. Illinois would recognize a valid Canadian guardianship and so a Canadian guardian—like an Illinois guardian—would be incapable of kidnapping his ward from Illinois. Thus, since the guardians' conduct would not be criminal in Illinois, the dual criminality requirement of the Treaty is not met.

ORDERED: Petitioners' motion for habeas corpus relief from an order of extraditabil-

ity is granted. The Magistrate Judge's finding of extraditability is overruled on grounds that the petitioners' conduct failed to meet the dual criminality requirement of the U.S.–Canada extradition treaty.